No. 21-3162

# In the United States Court of Appeals for the Third Circuit

———————

BRIAN A. DAVIS; FREDRICKA K. BECKFORD,

*Appellants*

v.

GEORGE C. WIGEN, Former Warden, Moshannon Valley Correctional Center; THE GEO GROUP, INC.; DONNA MELLENDICK, Former Administrator, Bureau of Prisons Privatization Management Branch; DAVID O'NEILL, Assistant Field Director, Department of Homeland Security,

*Defendants-Appellees*

———————

On Appeal from the United States District Court for the Western District of Pennsylvania, No. 3:16-cv-00026
Hon. Kim R. Gibson

———————

## BRIEF OF *AMICI CURIAE* MUSLIM PUBLIC AFFAIRS COUNCIL (MPAC) AND DR. JACQUELINE C. RIVERS

———————

NICHOLAS REAVES
CHRISTOPHER PAGLIARELLA
YALE LAW SCHOOL FREE
EXERCISE CLINIC
1919 Penn. Ave. N.W.
Suite 400
Washington, D.C. 20006

DINO L. LAVERGHETTA*
MACKENZI J.S. EHRETT
ROBERT M. SMITH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
*Counsel of Record

May 2, 2022

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................ii

INTEREST OF AMICI CURIAE.............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................5

ARGUMENT ............................................................................9

  I.  RFRA and RLUIPA are Crucial to Protecting the Religious Freedom of all Religious Minorities..............................9

    A. Islamophobia remains a threat to American Muslims............ 10

    B. RFRA and RLUIPA are critical safeguards for the religious freedom of incarcerated people, a disproportionate number of whom are Muslim..................... 12

  II. RFRA and RLUIPA Protect Religious Practices Even if Not Compelled by or Central to One's Religious Beliefs. ................... 14

    A. RFRA's plain text and legislative history confirm that it protects religious exercise even if not mandatory or required by one's faith. ........................................... 16

    B. Precedent confirms that the government's complete prohibition of non-mandatory religious exercise constitutes a substantial burden under RFRA. ..................... 20

    C. Appellants have stated a *prima facie* claim for a RFRA violation by showing that the government prohibited their religious marriage. ....................................... 24

  III. Limiting RFRA's Protections to Mandatory Religious Practices Would Violate Principles of Religious Autonomy and Uniquely Burden Religious Minorities. ................................ 25

CONCLUSION ...................................................................... 30

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ali v. Stephens*,
  822 F.3d 776 (5th Cir. 2016)..............................................................28

*Ashaheed v. Currington*,
  7 F.4th 1236 (10th Cir. 2021) ...........................................................28

*Askew v. Trs. of the Gen. Assembly of Church of the Lord
  Jesus Christ of the Apostolic Faith Inc.*,
  684 F.3d 413 (3d Cir. 2012) ..............................................................27

*Bryant v. Gomez*,
  46 F.3d 948 (9th Cir. 1995)................................................................17

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)....................................................................18, 20

*C.L. for Urb. Believers v. City of Chicago*,
  342 F.3d 752 (7th Cir. 2003).......................................................18, 19

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005)..........................................................................15

*Daley v. Lappin*,
  555 F. App'x 161 (3d Cir. 2014) .................................................21, 22

*Dehart v. Horn*,
  227 F.3d 47 (3d Cir. 2000) ................................................................29

*Emp. Div., Dep't of Hum. Res. v. Smith*,
  494 U.S. 872 (1990)............................................................................5

*Green v. Solano Cnty. Jail*,
  513 F.3d 982 (9th Cir. 2008).............................................................23

*Haight v. Thompson,*
    763 F.3d 554 (6th Cir. 2014) ........................................................ 19, 24

*Henderson v. Muniz,*
    196 F. Supp. 3d 1092 (N.D. Cal. 2016) .............................................. 13

*Hicks v. Garner,*
    69 F.3d 22 (5th Cir. 1995) .................................................................. 17

*Holt v. Hobbs,*
    574 U.S. 352 (2015) ............................................................... 13, 20, 28

*Johnson v. Baker,*
    23 F.4th 1209 (9th Cir. 2022) ........................................ 13, 15, 23, 24

*Jones v. Carter,*
    915 F.3d 1147 (7th Cir. 2019) .......................................................... 19

*Jones v. Slade,*
    23 F.4th 1124 (9th Cir. 2022) ................................................... *passim*

*Kay v. Bemis,*
    500 F.3d 1214 (10th Cir. 2007) ........................................................ 23

*Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox
    Church in N. Am.,*
    344 U.S. 94 (1952) ............................................................................. 26

*Kikumura v. Hurley,*
    242 F.3d 950 (10th Cir. 2001) .......................................................... 19

*Larry v. Goldsmith,*
    799 F. App'x 413 (7th Cir. 2020) ..................................................... 13

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh,*
    903 F.3d 113 (3d Cir. 2018) .............................................................. 27

*Mack v. Warden Loretto FCI,*
    839 F.3d 286 (3d Cir. 2016) ....................................................... 21, 24

*Nance v. Miser,*
    700 F. App'x 629 (9th Cir. 2017) ..................................................... 28

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) .................................................................. 26, 29

*Petruska v. Gannon Univ.*,
   462 F.3d 294 (3d Cir. 2006) ............................................................... 27

*Puri v. Khalsa*,
   844 F.3d 1152 (9th Cir. 2017) ........................................................... 26

*Sherbert v. Verner*,
   374 U.S. 398 (1963) .......................................................................... 10

*Smith v. Cruzen*,
   No. 14-CV-04791, 2017 WL 4865565 (N.D. Cal. Oct. 26,
   2017), *aff'd*, 735 F. App'x 434 (9th Cir. 2018) .................................. 13

*Tanzin v. Tanvir*,
   141 S. Ct. 486 (2020) ........................................................................ 11

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
   450 U.S. 707 (1981) .................................................................... 26, 29

*Van Wyhe v. Reisch*,
   581 F.3d 639 (8th Cir. 2009) ............................................................ 19

*Washington v. Klem*,
   497 F.3d 272 (3d Cir. 2007) ........................................................ 20, 21

## Statutes

42 U.S.C. § 2000bb-1 .................................................................... 16, 20

42 U.S.C. § 2000bb-2(4) ............................................................. 5, 16, 18

42 U.S.C. § 2000cc-5(7)(A) ........................................................... 6, 16

Religious Freedom Restoration Act of 1993, Pub. L. No. 103-
   141, 107 Stat. 1488 .......................................................................... 17

Religious Land Use and Institutionalized Persons Act of
   2000, Pub. L. No. 106-274, 114 Stat. 803 .................................... 18, 19

## Legislative Materials

*Protecting Religious Freedom After* Boerne v. Flores*: Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 105th Cong. (1997) ............................................................ 9

*Protecting Religious Freedom After* Boerne v. Flores *(Part III): Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 105th Cong. (1998), https://perma.cc/283Q-6N3J ............................................................ 28

## Scholarly Authorities

Abu B. Bah, *Racial Profiling and the War on Terror: Changing Trends and Perspectives*, 29 Ethnic Stud. Rev. 76 (2006) ................................................................................ 11

Craig Considine, *The Racialization of Islam in the United States: Islamaphobia, Hate Crimes, and "Flying While Brown,"* 8 Religions 165 (2017) ............................................ 11

Gabrielle M. Girgis, *What Is a "Substantial Burden" on Religion Under RFRA and the First Amendment?*, 97 Wash. U. L. Rev. 1755 (2020) ............................................ 29

Luke W. Goodrich & Rachel N. Busick, *Sex, Drugs, and Eagle Feathers: An Empirical Study of Federal Religious Freedom Cases*, 48 Seton Hall L. Rev. 353 (2018) ................ 9

## Other Authorities

Randall Balmer, *Religious Diversity in America*, Nat'l Humans. Ctr. (2009), https://perma.cc/RE9ADCHG ........................ 10

Besheer Mohamed, *Muslims Are a Growing Presence in U.S., but Still Face Negative Views from the Public*, Pew Rsch. Ctr. (Sept. 1, 2021), https://perma.cc/67VQ-FMXL ............................ 10

Asma T. Uddin, *When Islam Is Not a Religion: Inside America's Fight for Religious Freedom* (2019) .................................... 10

U.S. Dep't of Just., *Audit of the Federal Bureau of Prisons'
   Management and Oversight of Its Chaplaincy Services
   Program* (July 2021), https://perma.cc/9Y5K-YKDT ......................... 12

U.S. Dep't of Just., *Report on the Twentieth Anniversary of
   the Religious Land Use and Institutionalized Persons Act*
   (Sept. 22, 2020), https://perma.cc/9B3Z-ECE6 .................................. 12

## INTEREST OF AMICI CURIAE[1]

The Muslim Public Affairs Council (MPAC) is a community-based public affairs nonprofit organization that has worked since 1988 to foster a vibrant Muslim American identity and represent the interests of Muslim Americans. MPAC aims to increase public understanding of Islam and to improve policies affecting American Muslims by engaging government, media, and communities, and demonstrating that America is enriched by Muslims' vital contributions. MPAC works diligently to offer the public a portrayal that goes beyond stereotypes, showing that Muslims are part of a vibrant American pluralism.

In the courts, MPAC regularly files *amicus curiae* briefs in cases raising issues of vital concern to the Muslim American community, including cases involving the free exercise of religion. *See, e.g.*, Brief of

---

[1] No counsel for any party authored this brief, in whole or in part. No person or entity other than amici contributed monetarily to its preparation or submission. Both Parties of record have consented to the filing of this amicus brief.

This brief was prepared in part by a clinic operated by Yale Law School but does not purport to represent the school's institutional views, if any. Amici appreciate the assistance of Ayesha M. Durrani, Bella Gianani, Robert. D. Capodilupo, and Joseph E. Simmons in the preparation of this brief.

*Amici Curiae* the Sikh Coalition and MPAC, *Holt v. Hobbs*, 574 U.S. 352 (2015) (No. 13-6827), 2014 WL 2465969 (brief supporting Muslim prisoner's successful Religious Land Use and Institutionalized Person ("RLUIPA") challenge to grooming regulation); Brief of MPAC et al., *Agudath Isr. of Am. v. Cuomo*, 141 S. Ct. 889 (2020) (No. 20A90) (brief supporting Jewish organizations' successful Free Exercise challenge to COVID-19 restrictions); Brief of *Amicus Curiae* MPAC, *Johnson v. Baker*, 23 F.4th 1209 (9th Cir. 2022) (No. 20-17202) (brief supporting Muslim prisoner's successful RLUIPA claim to possess religious prayer oils in his cell). Because Muslims are disproportionately represented in the American prison population, MPAC has a particular interest in ensuring that the religious freedoms of the incarcerated are steadfastly protected. In prison environments—where nearly every religious practice requires approval of government agents—the protections the Religious Freedom Restoration Act ("RFRA") and RLUIPA are particularly important to those who practice minority faiths, such as Islam. Those statutes act as bulwarks against the discrimination and abuse that adherents of minority faiths would otherwise face in a system that often lacks understanding of or tolerance for their religious beliefs.

Dr. Jacqueline C. Rivers is the Executive Director and Senior Fellow for Social Science and Policy of the Seymour Institute for Black Church and Policy Studies. The Seymour Institute's mission is to educate and train black church leaders, as well as the public, on Christian philosophy and theological understandings of the Black church. Dr. Rivers is also a Senior Fellow in the Center for the Study of Christianity and the Black Experience at the King's College. She has served as a lecturer in both Sociology and African American Studies at Harvard University and currently serves on the Board of Directors for the Becket Fund for Religious Liberty. She has spoken at the United Nations, Princeton University, Stanford University, the Vatican, and other similar institutions. Her writings include, among many others, "The Paradox of the Black Church and Religious Freedom," a chapter in the volume *Not Just Good but Beautiful*, a book co-authored with Pope Francis, N.T. Wright, Jonathan Sack, and others. Dr. Rivers's work and writings emphasize the importance of religious liberty, especially among historically oppressed minority groups.

Dr. Rivers holds a PhD from Harvard University where she was a Doctoral Fellow in the Multidisciplinary Program in Inequality and

Social Policy of the J. F. Kennedy School of Government. Dr. Rivers was born and raised in Jamaica and now lives in Dorchester, MA, with her husband, Reverend Eugene F. Rivers, III.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case raises a question of unique importance to religious minorities: whether the federal laws passed to protect the free exercise rights of religious minorities extend to all religious practices, or just those practices that a court concludes are *mandated* by a particular faith. As the United States Supreme Court has observed: "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 887 (1990) (alteration in original) (quoting *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989)). Yet, if the District Court's opinion in this case were left to stand, that is precisely what courts would be called upon to do in every RFRA and RLUIPA[2] case. Such an approach is flatly inconsistent with the statutes' plain text and legislative history and would have a disproportionately prejudicial impact on adherents of minority faiths.

---

[2] RFRA's definition of "exercise of religion" incorporates RLUIPA's definition of such by reference. *See* 42 U.S.C. § 2000bb-2(4) (incorporating the definition in § 2000cc-5(7)(A)).

5

The District Court found that: (1) Mr. Davis and Ms. Beckford "sincerely wanted to marry, and sincerely viewed their marriage as an expression of their faith;" and (2) prison officials prevented that expression of faith by prohibiting their marriage. *Davis v. Geo Grp., Inc.*, A.27. Nonetheless, the Court held that Appellants failed to state a *prima facie* case under RFRA, because they did not show that marriage was *required* by their religion. A.26–28. That is not the law, and the District Court's decision should be vacated.

There is no requirement under RFRA that a religious practice be mandated by or "central" to a particular faith in order for that practice to enjoy the statute's protections. To the contrary, the statute explicitly protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). In drafting the text, Congress expressly sought to overrule a prior line of cases that attempted to limit protections to only those religious practices deemed "central" to a faith's system of beliefs. In light of the statute's unambiguous text and purpose, the courts have routinely held that all religious exercise—not just "central" or "compelled" practices—enjoy RFRA's protections.

Not only is this broad reading correct as a matter of text, precedent, and intent; it is also necessary to avoid the unconstitutional entanglement of courts in religious questions and to prevent religious discrimination. If RFRA protected only mandatory or "central" religious practices, courts would be required to distinguish mandatory religious practices from those which are only *recommended* or *suggested* for one's spiritual development. For religious scholars, these are fraught and difficult questions. For federal courts, they are all but impossible to answer: Which religious authorities should courts look to when deciding these questions? What if two authorities disagree? What about for non-hierarchical faiths? What if a religious claimant has idiosyncratic beliefs? How could a court distinguish between "central" and "non-central" practices for faiths without such a framework? The list could go on.

These problems are only exacerbated for religious minorities, as federal judges are likely to be unfamiliar with minority religious practices, are more likely to misunderstand minority religious obligations, and almost certainly lack the religious training necessary to resolve the complex religious disputes which will inevitably arise (assuming a resolution is even possible).

The better approach when confronted with these myriad questions—and the approach required by RFRA's plain text—is to read RFRA to protect religious exercise *whether or not* compelled by or central to one's faith. This approach will ensure that courts do not unfairly restrict the rights of religious minorities, while still giving courts sufficient tools to ensure that RFRA's important protections are reserved for sincere, religious practices.

# ARGUMENT

## I.    RFRA and RLUIPA are Crucial to Protecting the Religious Freedom of all Religious Minorities.

Religious minorities in America rely disproportionately on RFRA and RLUIPA for protection, making both statutes of particular importance for *amici*. *See* Luke W. Goodrich & Rachel N. Busick, *Sex, Drugs, and Eagle Feathers: An Empirical Study of Federal Religious Freedom Cases*, 48 Seton Hall L. Rev. 353, 376 (2018) (finding that "[o]ver half of all prisoner decisions involved non-Christian religious minorities [and] [t]he most frequently appearing were Muslims, Jews, and Native Americans"). This is no surprise, as Congress passed both statutes with religious minorities top of mind. *See, e.g.*, *Protecting Religious Freedom After* Boerne v. Flores*: Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 105th Cong. 10 (1997) (statement of Rep. Jerrold Nadler) ("[O]ne of Congress' principal concerns was that, as a practical matter, unpopular and minority faiths would receive a less sympathetic hearing …."). Today, all religious minorities—and Muslim Americans in particular—benefit from a robust enforcement of RFRA and RLUIPA.

**A. Islamophobia remains a threat to American Muslims.**

The United States has long been a refuge for persecuted religious groups and practitioners of minority faiths. *See, e.g.*, *Sherbert v. Verner*, 374 U.S. 398, 411 (1963) (Douglas, J., concurring) ("[M]any people hold beliefs alien to the majority of our society—beliefs that are protected by the First Amendment but which could easily be trod upon under the guise of 'police' or 'health' regulations reflecting the majority's views."); Randall Balmer, *Religious Diversity in America*, Nat'l Humans. Ctr. (2009), https://perma.cc/RE9ADCHG. And yet, this promise sometimes rings hollow for many Muslims in America.

Polling suggests that "about half of Muslim American adults (48%) said they had personally experienced some form of discrimination because of their religion in the previous year." Besheer Mohamed, *Muslims Are a Growing Presence in U.S., but Still Face Negative Views from the Public*, Pew Rsch. Ctr. (Sept. 1, 2021), https://perma.cc/67VQ-FMXL. And, unfortunately, the misconception that "Islam encourages violence more than other religions" has grown in recent years as the number of Muslims in America has increased. *Id.*; *see also* Asma T. Uddin, *When Islam Is Not a Religion: Inside America's Fight for Religious Freedom* 75 (2019) ("Where once there were years of cohabitation and

10

community, there is now anger, distrust, and even violence. The false idea that 'Islam is not a religion' is gaining ground."). Post-9/11, Muslim Americans have also become the subject of disproportionate law enforcement surveillance, profiling, and coercion. *See Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020); Abu B. Bah, *Racial Profiling and the War on Terror: Changing Trends and Perspectives*, 29 Ethnic Stud. Rev. 76 (2006); Craig Considine, *The Racialization of Islam in the United States: Islamaphobia, Hate Crimes, and "Flying While Brown,"* 8 Religions 165 (2017) ("A review of recent polls shows that the majority of non-Muslims in the United States have become increasingly hostile towards Muslims, paralleling the developing discourse among politicians and media outlets.").

The pervasiveness of anti-Muslim bias makes the legal protection of minority religions all the more crucial. For this already vulnerable religious minority—and for many others—a narrowing of the protections offered by RFRA and RLUIPA would disproportionately restrict their rights. And perhaps nowhere else is this risk of such harm greater than in the prison context.

## B. RFRA and RLUIPA are critical safeguards for the religious freedom of incarcerated people, a disproportionate number of whom are Muslim.

Though Muslims make up just 1% of the American population, nearly 10% of the federal prison population practices Islam. U.S. Dep't of Just., *Audit of the Federal Bureau of Prisons' Management and Oversight of Its Chaplaincy Services Program* 27 (July 2021), https://perma.cc/9Y5K-YKDT. In prison, where nearly every religious practice requires the prior approval of prison administrators, adherents of minority faiths face burdens that followers of better-known religions do not. For example, followers of minority faiths must explain and request accommodations for each aspect of their religious practice—from diet to dress—while followers of better-known religions are more easily understood and accommodated, if not already expressly provided for in institutional rules. The Department of Justice confirmed that "RLUIPA claims in institutional settings are most often raised by people who practice minority faiths," and that "the majority of the cases the Department has pursued involv[e] religions other than Christianity." U.S. Dep't of Just., *Report on the Twentieth Anniversary of the Religious Land Use and Institutionalized Persons Act* 25-26 (Sept. 22, 2020), https://perma.cc/9B3Z-ECE6.

Muslim prisoners have long depended on the protections granted by RFRA and RLUIPA to practice various aspects of their faith, including diet, prayer, dress, and religious holidays. *See, e.g.*, *Larry v. Goldsmith*, 799 F. App'x 413 (7th Cir. 2020) (the ability to pray at the appropriate times); *Smith v. Cruzen*, No. 14-CV-04791, 2017 WL 4865565 (N.D. Cal. Oct. 26, 2017) (the ability to pray communally), *aff'd*, 735 F. App'x 434 (9th Cir. 2018); *Holt*, 574 U.S. 352 (ability to grow a beard); *Henderson v. Muniz*, 196 F. Supp. 3d 1092 (N.D. Cal. 2016) (the right to appropriately celebrate Ramadan); *Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022) (access to reading materials); *Johnson v. Baker*, 23 F.4th 1209 (9th Cir. 2022) (prayer oils). Without the protections of RFRA and RLUIPA, many Muslim prisoners would be prevented from practicing crucial aspects of their faiths.

This case, though about Christian beliefs, has broad implications for the many thousands of Muslim Americans subject to government restrictions on their religious exercise. Like Appellants' religious exercise, the practices of many Muslim prisoners are frequently misunderstood or treated with skepticism. Yet unfamiliarity is not an excuse to limit religious freedom. For incarcerated adherents of all

minority faiths, strong RFRA and RLUIPA protections are essential safeguards for their religious practice. Without the refuge provided by RFRA and RLUIPA's, many Muslim prisoners would lack the ability to practice important elements of their faith. Accordingly, it is crucial that courts interpret these statutes to confer the full breadth of protection that Congress envisioned for religious minorities.

## II.    RFRA and RLUIPA Protect Religious Practices Even if Not Compelled by or Central to One's Religious Beliefs.

In this case, the District Court's opinion rested on the premise that RFRA's protections only apply to religious conduct that is compelled by an individual's faith. The court accepted that Appellants sought to marry one another as a sincere expression of their faith. *Davis*, A.26–27. Nonetheless, the court held that the State's prohibition of their marriage did not violate RFRA because Appellants did not allege that marriage was *required* by their religion. *Id.* (finding that Appellants failed to state a *prima facie* case because they did not allege "that Defendants compelled them to stop engaging in religious conduct that their faith *prescribed*" (emphasis added)). The court's reasoning is a clear error of law.

In order to determine whether a plaintiff has made a *prima facie* case for a RFRA violation, courts are required to engage in a two-part

analysis: (1) the court must "first identify the religious exercise at issue"; and (2) once the scope of the religious exercise has been defined, the court must determine whether the government's actions "constitute[] a substantial burden on [the plaintiff's] religious exercise." *Jones*, 23 F.4th at 1140–41. In this case, because Appellants' desire to marry was a sincere expression of their faith, that religious practice is subject to RFRA's protections, regardless of whether it is required by their religion. *Cutter v. Wilkinson*, 544 U.S. 709, 715–16 (2005) (acknowledging that RLUIPA's definition of free exercise extends to "any exercise of religion," even those "not compelled by, or central to, a system of religious belief" (quoting 42 U.S.C. § 2000cc-5(7)(A))). Furthermore, once it is determined—as it must be—that Appellants' desired marriage constitutes religious exercise, it is beyond dispute that the government's absolute prohibition of that religious practice constitutes a substantial burden on Appellants' free exercise of religion. *See Johnson*, 23 F.4th at 1215 ("Of course, when a regulation 'outright ban[s]' religious exercise, it amounts to a substantial burden.").

**A. RFRA's plain text and legislative history confirm that it protects religious exercise even if not mandatory or required by one's faith.**

RFRA defines "exercise of religion" by reference to RLUIPA, which in turn defines religious exercise to include "any exercise of religion, *whether or not compelled by*, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added); *see also id.* § 2000bb-2(4) (incorporating the definition in § 2000cc-5(7)(A)). RFRA then instructs the government not to "substantially burden" this "exercise of religion," *id.* § 2000bb-1(a), absent a compelling government interest pursued through the least restrictive means, *id.* § 2000bb-1(b). Thus, the range of religious practices RFRA protects is determined with reference to RFRA's definition of "exercise of religion," which explicitly disclaims any requirement for the religious practice to be "compelled" by or "central" to a particular faith.

The broad protections provided by RFRA are clear on the statute's face. But, if more were needed, RFRA's legislative history confirms that Congress specifically intended to protect the free exercise of all sincere religious practices, regardless of whether those practices are compelled by a particular faith. As originally enacted, RFRA defined "exercise of religion" as co-extensive with the Free Exercise Clause's definition of

religious exercise. Specifically, Section 5 of RFRA provided that "the term 'exercise of religion' means the exercise of religion under the First Amendment to the Constitution." Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, § 5(4), 107 Stat. 1488, 1489 (codified as amended at 42 U.S.C. § 2000bb-2(4)). Several courts then interpreted RFRA narrowly, concluding that it only protected against substantial burdens on 'compelled' or 'central' religious practices. *See, e.g.*, *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) ("Bryant has not provided any facts to show that the activities which he wishes to engage in are mandated by the Pentecostal religion."); *Hicks v. Garner*, 69 F.3d 22, 26 n.22 (5th Cir. 1995) (collecting cases defining substantial burden on religious exercise under RFRA, all of which focus on "central" or "mandated" religious practices).

In response to this narrowing precedent, when Congress enacted RLUIPA, it defined "exercise of religion" using the broad definition discussed above. Simultaneously, Congress amended RFRA's definition of "exercise of religion" to match the broader RLUIPA formulation. Thus, Congress struck the phrase "the exercise of religion under the First Amendment to the Constitution" from RFRA's definition of "exercise of

religion" and instead inserted the phrase "religious exercise, as defined in section 8 of the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C. § 2000cc-5]." Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106-274, § 7(a)(3), 114 Stat. 803, 806; *see* 42 U.S.C. § 2000bb-2(4) (current Section 5 of RFRA); *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695–96 (2014) ("RLUIPA amended RFRA's definition of the 'exercise of religion.'"). Courts have recognized that this revision "reveals Congress's intent to expand the concept of religious exercise contemplated both in decisions discussing the precursory RFRA and in traditional First Amendment jurisprudence." *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003) (explaining that RLUIPA's expanded definition of religious exercise "reveals Congress's intent to expand the concept of religious exercise contemplated both in decisions discussing the precursory RFRA and in traditional First Amendment jurisprudence" (citations omitted)); *see also Hobby Lobby*, 573 U.S. at 695–96 ("RLUIPA amended RFRA's definition of the 'exercise of religion.'").

Moreover, Congress included a rule of construction in RLUIPA specifically requiring that "[t]his Act shall be construed in favor of a

broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the Constitution." RLUIPA, § 5(g), 114 Stat. at 806. This also applies to RFRA, which incorporates RLUIPA's definition by reference. *See* 42 U.S.C. § 2000bb-2(4).

Given this clear congressional mandate for broad protection, courts have consistently held that RFRA and RLUIPA protect non-mandatory and non-compulsory religious exercise and have reiterated that both statutes must be construed broadly in favor of protecting religious liberty. *See, e.g.*, *Haight v. Thompson*, 763 F.3d 554, 566 (6th Cir. 2014) ("RLUIPA protects a broad spectrum of sincerely held religious beliefs, including practices that non-adherents might consider unorthodox, unreasonable or not 'central to' a recognized belief system." (quoting 42 U.S.C. § 2000cc-5(7)(A))); *C.L. for Urb. Believers*, 342 F.3d at 760 (similar); *Jones v. Carter*, 915 F.3d 1147, 1150 (7th Cir. 2019) (rejecting "the practice of offsetting against the burden imposed by the rule … the strength of the religious command"); *Van Wyhe v. Reisch*, 581 F.3d 639, 656 (8th Cir. 2009) ("RLUIPA's broad protection of 'religious exercise' extends even to religious practices that are not 'compelled by, or central to' a certain belief system."); *Kikumura v. Hurley*, 242 F.3d 950, 960–61

(10th Cir. 2001) (holding that non-mandatory pastoral visit was still protected religious exercise under RLUIPA); *Hobby Lobby*, 573 U.S. at 693 ("Congress enacted RFRA … to provide very broad protection for religious liberty."); *Holt*, 574 U.S. at 356 (same).

## B. Precedent confirms that the government's complete prohibition of non-mandatory religious exercise constitutes a substantial burden under RFRA.

Once the religious exercise has been identified, RFRA calls for courts to focus on the government's actions and determine whether those actions substantially burdened a plaintiff's free exercise of religion. *See* 42 U.S.C. § 2000bb-1(a)–(b). Even when a particular religious exercise is not mandated by an adherent's faith, its complete prohibition by the state has consistently been held to constitute a "substantial burden" under RFRA and RLUIPA.

In *Washington v. Klem*, for example, this Court held that the Pennsylvania Department of Corrections substantially burdened the plaintiff's religious practice of reading four new books a day by strictly limiting the number of books he could maintain in his cell. As *Klem* explained, because the prison's regulation "severely inhibit[ed] [plaintiff's] ability to read four new books per day," it "substantially burden[ed] the practice of [his] religion." *Washington v. Klem*, 497 F.3d

272, 279–83 (3d Cir. 2007). This Court's analysis did not turn on the nature of the plaintiff's religious exercise—reading four new books every day—but instead focused only on the impact of the prison's regulations on his ability to engage in his sincere religious exercise. *See id.* at 282–83. The District Court's reliance on *Mack v. Warden of Loretto FCA* was thus misplaced, because *Mack* adopts the test articulated in *Klem*, and confirms that a RFRA substantial burden analysis must focus solely on the government's actions, not the nature of the religious practice at issue. *See* 839 F.3d 286, 304 (3d Cir. 2016) (finding that a hostile work environment applied "indirect pressure" to plaintiff, causing him to abandon his religious practice of praying at work).

Even more instructive, this Court held in *Daley v. Lappin* that the district court committed legal error when it found that a Rastafarian inmate's religious diet was not deserving of RFRA's protections because his diet was "not a mandatory component of his religion." 555 F. App'x 161, 166 (3d Cir. 2014). This Court explained that the district court erred because it "inappropriately concluded that the nonmandatory nature of the dietary component of Daley's religion rendered it unprotected." *Id.* Vacating the lower court's holding, this Court confirmed that the focus of

the substantial burden analysis must remain on the *government*'s actions: "Daley has alleged that *he was denied access* to a diet that met the requirements of his religion ...." *Id.* (emphasis added). Because this constituted a complete prohibition on Daley's religious exercise, this Court vacated the district court's judgment and remanded for additional factual findings on the government's burden. *Id.*

Other circuits have similarly held that the government triggers RFRA and RLUIPA's protections when it prohibits non-mandatory religious practices. The Ninth Circuit, for example, reversed a district court that dismissed an inmate's claims because the inmate had not shown that access to Nation of Islam religious texts was *necessary* to his observance of Ramadan. *Jones*, 23 F.4th at 1142. The Court rejected the district court's reasoning that the restriction "imposed no substantial burden on Jones's religious exercise because Jones did not 'articulate[] ... what has occurred to render him now unable to successfully observe Ramadan *without* the books he requested.'" *Id.* (emphasis original). The Ninth Circuit explained that "[b]ecause RLUIPA does not require Jones to show his religious exercise was either *required by his faith* or consistent with his past observance," he was not obligated to point to a

religious mandate for his request. *Id.* at 1142–43 (emphasis added). "Having defined the scope of Jones's religious exercise—reading his Nation of Islam texts during Ramadan," the Ninth Circuit then "consider[ed] whether excluding Jones's texts as contraband constitute[d] a substantial burden on his religious exercise." *Id.* at 1142. Ultimately, the court "had little difficulty concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise." *Id.* at 1144 (cleaned up); *see also, e.g.*, *Johnson*, 23 F.4th at 1215 ("[I]t makes no difference that a prisoner may still practice his 'religion as a whole' under the State's restrictions, or that not every believer of the same faith practices in the same way." (citations omitted)); *Kay v. Bemis*, 500 F.3d 1214, 1220 (10th Cir. 2007) (finding that "the district court erred in requiring [plaintiff's] pleading to indicate that the use of tarot cards and other items were 'necessary' to the practice of his religion"); *Green v. Solano Cnty. Jail*, 513 F.3d 982, 988 (9th Cir. 2008) ("We have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise.").

**C. Appellants have stated a *prima facie* claim for a RFRA violation by showing that the government prohibited their religious marriage.**

At bottom, RFRA's *prima facie* requirements are straightforward and easily met here. First, a plaintiff must show that his burdened conduct is both sincere and religious. This religious exercise need not be compelled by or central to the plaintiff's faith. Section II.B, *supra*. Identification of a sincere religious exercise is all that is required. The government concedes this here. *Davis*, A.26–27. Second, courts must assess the burden imposed by the government on that specified religious exercise. This analysis takes the religious exercise as given and determines whether the government has "substantially" burdened it. Here, the key facts are not in dispute: Defendants have forbidden Plaintiffs' religious exercise. A.26–28. This *complete prohibition* is the quintessential substantial burden. Section II.B, *supra*; *Haight*, 763 F.3d at 565 ("The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)."); *Johnson*, 23 F.4th at 1215 ("Of course, when a regulation 'outright ban[s]' religious exercise, it amounts to a substantial burden."); *cf. Mack*, 839 F.3d at 304 (even "indirect pressure" to "cease" a religious exercise can constitute a substantial burden). Accordingly, this Court should find that the District

24

Court committed legal error, vacate its decision, and remand this case for further proceedings.

### III. Limiting RFRA's Protections to Mandatory Religious Practices Would Violate Principles of Religious Autonomy and Uniquely Burden Religious Minorities.

The District Court's interpretation of the substantial burden requirement—which would limit RFRA's protections to religious practices either *prescribed* by one's faith or to conduct *prohibited* by one's faith—would place courts in the position of religious arbiters, forced to decide whether certain religious practices are sufficiently "central" or religiously compelled to merit protection. This places enormous pressure on courts to weigh in on religious questions which no civil court should answer. And for minority faith groups with moral frameworks that do not mandate or forbid (but merely encourage or discourage) particular religious practices, such judicial inquiries are even more entangling. *See, e.g.*, *Jones*, 23 F.4th at 1142–43 (declining to opine on whether Nation of Islam texts were or were not necessary for Jones to properly observe Ramadan).

The doctrines of ecclesiastical abstention and religious autonomy— both of which are rooted in the text of the First Amendment—ensure the free exercise rights of the religious and protect against governmental

entanglement in religious affairs. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) ("The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" (quoting *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952))); *Puri v. Khalsa*, 844 F.3d 1152, 1164 (9th Cir. 2017) ("[T]he ecclesiastical abstention doctrine is a qualified limitation, requiring only that courts decide disputes involving religious organizations 'without resolving underlying controversies over religious doctrine.'" (citation omitted)). Courts are not competent to decide whether a religious practice is "central" to one's faith, or whether a certain religious exercise is compelled or merely hortatory. As the Supreme Court put it, "[c]ourts are not arbiters of scriptural interpretation." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981); *see also Morrissey-Berru*, 140 S. Ct. at 2060 ("[A]ny attempt by government to dictate or even to influence [matters of faith and doctrine] would constitute one of the central attributes of an establishment of religion."); *Kedroff*, 344 U.S. at 115 ("questions … of faith" are off limits to civil courts).

This Court has, on numerous occasions, affirmed these same principles. *E.g.*, *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 120 (3d Cir. 2018) (finding it "[e]ntangl[ing]" when "the government is placed in the position of deciding between competing religious views" (first alteration original) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 311 (3d Cir. 2006))); *Askew v. Trs. of the Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 418 (3d Cir. 2012) ("The First Amendment 'severely circumscribes' the role that civil courts may play in resolving disputes touching on matters of faith."); *Petruska*, 462 F.3d at 306 ("The Free Exercise Clause protects … a religious institution's right to decide matters of faith, doctrine, and church governance.").

Adopting the reasoning that the District Court used in this case would mean that courts would be forced to weigh in on competing interpretations of religious doctrine, pick sides in religious disputes, determine lines of spiritual authority, and opine on thorny theological imponderables. Numerous faith traditions have practices which may not be mandatory but which are nonetheless considered beneficial or efficacious for individual believers. For example, during Senate

Subcommittee hearings on RLUIPA, Muslim scholar Dr. Imad-ad-Dean Ahmad testified that "[i]n Islam, the growing of a beard falls in the category of religiously motivated acts called '*sunnah*.' Although such acts are not necessarily mandatory, their desirability is well-established by Muslim tradition." *Protecting Religious Freedom After* Boerne v. Flores *(Part III): Hearing Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 105th Cong. 24 (1998) (prepared statement of Imad A. (Dean) Ahmad, Ph.D., Am. Muslim Council), https://perma.cc/283Q-6N3J. Courts across the country, including the Supreme Court, have repeatedly protected the right of Muslims to grow a beard for religious reasons, even if that religious accommodation may not—at least according to some scholars—be "mandatory." *Id.*; *Holt*, 574 U.S. at 356; *Ashaheed v. Currington*, 7 F.4th 1236, 1241, 1243 (10th Cir. 2021); *Nance v. Miser*, 700 F. App'x 629 (9th Cir. 2017); *Ali v. Stephens*, 822 F.3d 776, 794 (5th Cir. 2016). In contrast, the District Court's reasoning would require future courts to play religious scholar and weigh in on the centrality of beards to the practice of Islam.

The burden the District Court's reasoning foists onto the courts becomes even more unworkable when considering religions which "may

not have *any mandates at all*," meaning that "if only mandatory conduct were covered, those religions could be regulated out of existence without raising a legal problem." Gabrielle M. Girgis, *What Is a "Substantial Burden" on Religion Under RFRA and the First Amendment?*, 97 Wash. U. L. Rev. 1755, 1767 (2020). Further, adherents of the same faith often practice their faiths differently or hold different beliefs to be mandatory, putting courts in the position of resolving intra-denominational disputes between believers with different conceptions of what their faith requires. *But see Morrissey-Berru*, 140 S. Ct. at 2055 (courts should abstain from wading into intra-denominational and doctrinal matters).

If the substantial burden inquiry hinges—as the District Court found—upon the courts determining what is religiously mandatory, they are faced with a fraught task. The bottom line is that RFRA demands that *all* sincere religious exercise—mainstream or idiosyncratic; mandatory or permissive—must be treated the same under law. *Thomas*, 450 U.S. at 715–16 ("The guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect."); *Dehart v. Horn*, 227 F.3d 47, 56 (3d Cir. 2000) (en banc) ("It would be inconsistent with a long line of Supreme Court precedent to accord less

respect to a sincerely held religious belief solely because it is not held by others.").

## CONCLUSION

For the foregoing reasons, the Court should confirm that RFRA bars the government from prohibiting sincere but non-mandatory religious practices, and reverse the District Court's decision.

Respectfully Submitted,

*/s/ Dino L. LaVerghetta*

Dino L. LaVerghetta*
dlaverghetta@sidley.com
Mackenzi J.S. Ehrett
mehrett@sidley.com
Robert M. Smith
robert.m.smith@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Phone: 202-736-8000
*Counsel of Record*

Nicholas Reaves
nicholas.reaves@yale.edu
Christopher Pagliarella
christopher.pagliarella@yale.edu
YALE LAW SCHOOL FREE EXERCISE
CLINIC
1919 Pennsylvania Ave. N.W.,
Suite 400
Washington, D.C. 20006

*Counsel for amici curiae*

30

# CERTIFICATE OF COMPLIANCE

I, Dino L. LaVerghetta, certify as follows:

***Bar Membership:*** I am a member in good standing of the Bar of this Court.

***Type Volume:*** This brief contains 5,486 words, as counted by the word-processing software with which it was prepared.

***Electronic Filing:*** The electronic version of this brief was prepared in portable document format (.pdf) and is identical to the paper version of the brief filed with the Court. A virus scan was run on the electronic version of the brief, and no virus was detected.

Dated: May 2, 2022                                    */s/ Dino L. LaVerghetta*